Good morning. May it please the Court. My name is Stephen Witchley, and I represent James Beauchman in this criminal appeal. I'd like to reserve five minutes. I will attempt to reserve five minutes for rebuttal. Your Honors, we are raising sufficiency of the evidence challenges to two of the four counts that Mr. Beauchman was ultimately sentenced on. First, there was insufficient evidence for a rational trier of fact to find beyond a reasonable doubt that the conspiracy to manufacture methamphetamine charged in count one involved 500 or more grams of a mixture or substance containing methamphetamine. We can cut to the chase. Maybe that's an ill-fated pun there. There's really one issue here, and that's how does this Court define the phrase mixture or substance for purposes of the mandatory minimum sentence in 21 U.S.C. section 841. Frankly, this circuit has never addressed that issue after the United States Supreme Court's decision in the Chapman case. Our position is that under the market-oriented approach which is described in the Chapman case, mixture or substance means the amount of drugs which, without further processing, are able to be either distributed or consumed. Now, in order to fully understand our argument, I have to quickly talk about the facts of this case, which involves some numbers, and I apologize for that. There was methamphetamine or methamphetamine precursors found in various places around the house, in the garage in this case. First, there was a bucket of material that was found in the garage. There was liquid inside that bucket, which contained 17.7 grams of pseudoephedrine. Is that the right pronunciation for that? I always say pseudoephedrine, but that's what I'm going to continue saying. Also in that bucket were 5,200 grams of what was essentially described at trial as sludge, which was predominantly pill binder, waste product, in other words. There was testimony from Stephen Reed, whose testimony really is key, I think, to Mr. Bushman's argument in this case, that the 17.7 grams of pseudoephedrine could be made into 13.3 grams of methamphetamine. He was using a 75% conversion rate based on the method that the meth lab at that location was using to create methamphetamine. There were also 108 grams of pseudoephedrine found inside the house. Mr. Reed testified that 50 to 75 grams of methamphetamine could be manufactured from that pseudoephedrine, again, based on the red phosphorus method that was being used at that lab. Let's assume for purposes of argument that they could have actually manufactured the high end of that range, 75 grams. I didn't include this in my briefing, but I think in fairness to the government and in applying the standard, I think I should also include the methamphetamine that was found in Mr. Bushman's bedroom, the actual manufactured methamphetamine. There was 88.1 total grams of distributable methamphetamine found in Mr. Bushman's bedroom. This was actually the methamphetamine that formed the basis for count number two, which he also received a mandatory 10 year sentence on. Some of that methamphetamine was pure in the sense that it hadn't been cut yet. The rest of it was, I think, had been cut with caffeine and was 59% pure. Can we take it one step at a time? If we have an amount of methamphetamine that has been cut, would you agree that for sentencing purposes, the court could consider the total weight of, I'll call that a solution, even though solution is not the right word, because under your market oriented approach, that would be the form in which it was sold. Absolutely. And the Chapman opinion explicitly says that. It's the form in which the drugs are found, whether they're pure, cut, uncut. Whereas if we look at other precursors that were found and other cutting agents, including, what is it, pure caffeine? It's a brand name called Denature. Denature caffeine. Maybe we should see if we can get some of that just for the caffeine. I think I need that this morning. You and me both. Would you consider that in terms of the defendant's ability to cut or step on the pure methamphetamine that was found and say, well, geez, if he had, on the one hand, pure methamphetamine, on the other hand, a cutting agent, all he had to do was combine the two, and now he has a distributable quantity of twice that amount. I think that because it's a conspiracy to manufacture, that you could consider that. Now you're anticipating my next question, because we do have a conspiracy count here, so don't we have to look at the evidence that was before the jury that included the scope of the, I'll call it, the enterprise's methamphetamine distribution activities? And what evidence is there in the record that, well, they might have caught him on this particular day with this amount cooking, if I can use that term. The testimony was that they had previously distributed many more kilograms or grams of methamphetamine. Well, and that's the problem with the government's case here, is there isn't anything in the record to indicate that there was distribution prior to this day. They had just taken possession of that. They were unlucky meth manufacturers in the sense that Mr. Bushman and company had just taken possession of this property several weeks before. This was in essence a ---- The King County detective had been investigating Mr. Bushman for a year. Did he not testify to anything with regard to what Mr. Bushman was doing? He had been investigating Mr. Knight for a year. Oh, okay. But Knight was a charged co-conspirator, was he not? Right, who did not live on the premises, apparently. Mr. Knight, I mean, I think the theory was that Mr. Knight was sort of the main cook and he would come and do his work in the garage. Mr. Roberts and Mr. Bushman actually lived in the house. Well, can I ask the district court for sentencing purposes to consider the full scope of the enterprise's activities, including what Mr. Knight was up to? If Mr. Bushman is identified as being part and parcel of the cooking activity, can't the district court consider on a conspiracy count the total? I mean, can the jury consider it? Well, jury ---- Isn't the problem here that we're not talking about the sentencing at this point. We're talking about what went to the jury. Right. And it went to the jury on this theory, on the theory of the solution, and not on the theory of anything else but the conspiracy. Right. Well ---- With respect to the number of grams that were found, is that right? Well, what was argued at trial essentially was the contents of this flask that were in the garage, which I haven't gotten to yet. I think for your purposes in determining sufficiency of the evidence, given the lenient standard, that's why I'm throwing in all these other items, because I want to show that even if you take everything else that was in the house into consideration, that there is insufficient evidence. Well, never mind the math, all right? I mean, putting the math aside. We're tired of the math. You did a nice job. Thank you. Thank you. Doesn't this really come down to whether Beltran is still good law or not? I think it does, frankly. All right. And why isn't it? Because it's clear that no authority, including certainly the Sentencing Commission, can undermine precedent of court of appeals or the U.S. Supreme Court. And so it just strikes me that Beltran is still good law, and that being the case, then Reid's testimony, there's one and a half kilograms of liquid and material with meth in it, ends it. Beltran-Felix is still good law in the sense that it has not been explicitly overruled by the circuit. It is not good law, in my opinion, in the sense that it was decided two days prior to the U.S. Supreme Court's decision in Chapman. The language in Beltran-Felix specifically says, you know, we're not deciding this on a marketable basis. They actually use the word marketable. Two days later, the U.S. Supreme Court in Chapman rejected that and said that. How does it exactly do that? I mean, I don't read Chapman as doing that, and I don't know how you do. Where do you get that from? There is language in Chapman which specifically says, and, you know, I don't have the quote directly in front of me. Well, I know. It mentions, I've forgotten how it says it exactly. It mentions that Congress adopted a market-oriented approach to punishing drug trafficking, but Chapman itself did not address the question of whether it was limited to mixtures or substances that were in a marketable form, either for wholesale or retail. And so, I mean, it just doesn't do that. So how then is that sufficient for us to say it undermined Beltran? I think that Chapman did do that in the sense that the decision about the LSD and the carrier paper is specifically based on Chapman's interpretation of congressional intent. But its holding cuts against you, doesn't it? Because by saying that the blotter paper, the carrier, which presumably also contains LSD, was included in the weight, there was no argument in Chapman that the distributors were selling the blotter paper so that people could ingest, I don't know what you'd call it, but after you take the doses out, you're left with blotter paper that still has LSD in it. That, to me, cuts against your argument that we don't include all of the other sludge. I don't think it does, because in the special case of LSD, the item is so tiny that you cannot distribute it without the blotter paper or whatever else the carrier medium is. The question is, is the item necessary for either the distribution or the consumption of the drug? And in this case, we're talking about the jury being allowed to consider or the jury considering and finding a requisite amount based on what is essentially not only waste product, but toxic waste product that would be dangerous, could not be distributed, could not be ingested in any way, shape, or form. And that's clear from Stephen Reed's testimony. To trace through Judge Reimer's suggestion that Beltran is still good law, haven't we followed Beltran several times? And indeed, in Sprague suggested, to me, I don't know why, but we seem to have a rule that says that methamphetamine, manufacturing of methamphetamine is treated one way and other drugs are treated a different way. We sit in Sprague, we cite Beltran-Phoenix, and we cite another Ninth Circuit case that was after Beltran-Phoenix, which followed it. So how can we as a three-judge panel undo that at this point? I think – I don't think that Beltran-Phoenix has been explicitly followed by other cases. I think it's been cited. It was cited in the Sprague case, which did not deal specifically with this issue. United States v. Innie following – Sprague says, following Beltran-Phoenix, an affirming use of total weight of liquid mixture containing methamphetamine in sentencing. Well, Innie – Innie actually dealt with the retroactive application of an amendment to the sentencing guidelines, which clarified the definition of mixture or substance in light of Chapman and clarified it in a way, actually, that's favorable to Mr. Bush. But it assumes a continuing application of Beltran-Phoenix outside of that – that change. I will agree that no – that this circuit has not confronted the problem with Beltran-Phoenix, and this may end up being the case where that occurs. But I can't stand here and say the case has been overruled. It hasn't. But that isn't really the question. The question is whether there have been post-Chapman cases. Because your basic argument is that the two-day differences of significance, which it may be, and that it's – that something happened in Chapman that changed Beltran-Phoenix. But if we continue to follow Beltran-Phoenix after Chapman, then isn't that over the – we're over the bridge, too. Well, what I – I mean, all I can point out are the cases after Beltran-Phoenix, which – and again, this is a – this is a different context because it's the sentencing guidelines, 2D1 – 2D1.1. You know, any two – That is a different context. Right. And Grinton as well. But you're right. There – this Court has not confronted a case since Beltran-Phoenix where the – the What – what about the law in the other circuits at this point? How does it – how does it spin out? It splits down – you know, obviously, we like the Seventh Circuit. Mr. Bushman is quite fond of the Seventh Circuit right now because of the Stewart opinion. And the Stewart opinion, you know, is a 2004 case, which I cited in both the opening and the reply briefs. Factually, very similar to Mr. Bushman's case in terms of the type of mixture that we're talking about. And, you know, we would like the circuit to adopt the reasoning in Stewart. As far as the split among the circuits, I had this written down yesterday, and I know exactly where it is on my desk. But there are – there are several – there are several circuits, I think, which hold with Stewart. There's the Fifth Circuit, which kind of holds with Stewart but says there's a different rule for methamphetamine. The Tenth and the First Circuits are against Mr. Bushman. And I think it may be the Sixth and the Second are with him. And don't hold me to that. So there's a split. Is there any rationale for having a different rule for methamphetamine, if that's what we're down to? No. There isn't. We don't believe that there – I mean, it all comes down to how you define the phrase mixture or substance, and that – and that phrase is used throughout Section 841 in reference to a variety of drugs. Well, that can't be right, because obviously it is a mixture or substance. The question is at what juncture are you looking at the mixture or substance? Right. That's exactly right. And the rational way to look at it, given that what we're talking about is combating the distribution and consumption of illegal and what is actually usable. Is there – I'm not – I'm displaying my ignorance of modern narcotics. That'll make two of us. Or drugs here. But is there another drug that's manufactured like methamphetamine? I don't know how they make ecstasy or some of these others. There are drugs that are manufactured like methamphetamine in the sense that they can be homemade, like ecstasy, like crack cocaine. I am not aware of drugs that are manufactured in a homemade way that create the kind of, you know, byproducts and waste products. And this does seem to be kind of in a class by itself in that regard. Well, in the sense that it creates a lot of unusable junk. I suppose marijuana, if you think about the dirt in the pots and so forth, that would also be non-distributable portions of the process of the manufacture of marijuana. But we don't count that. Can I ask an actual question about this? There is this big flask, a really big flask apparently. And there is – at the point that the police officers find it, which I – I mean, one odd thing about this rule is that it matters – you have to come up with a point in time about what matters. So assuming it's when the police officers find it, was the solid precipitated to the bottom or a lot of it so that you basically had a layer of solid and a layer of liquid? Or would you have that it stood there long enough? And does that matter? The way it was found, there was liquid sitting on top of solid. And actually the 1,500 grams that was – that the jury was considering was the combined weight of both of those things. And there was testimony from Stephen Reed, the scientist, the chemist, that there were no appreciable levels of methamphetamine in the solid. So why is that a mixture? Why is it a mixture to have a layer of solid and a layer of liquid? I don't think it is a mixture. I think the liquid is the mixture. And we don't know the weight of that liquid because that was never given to the jury. The jury was just told we have these two things in the same container that are separate. But the flask is – is this the flask that was sitting on the burner? Correct. Yeah. So it's literally cooking as it's sitting on top of the burner, right? That is correct. And it's like forgetting to stir the soup pot when you're making the soup. That is incorrect. Because the liquid itself, as I understood the transcript, and I'm probably a worse cook than Stephen Reed was, but as I understood the transcript is that the solid is supposed to go to the bottom and then the methamphetamine is actually extracted from the liquid itself. Because what you're trying to do, as I understand it, the solids basically is the other stuff that comes from the cold pills that they buy by the bushel basket in order to extract the pseudoephedrine. I think those had already been extracted. I think these are other ways to buy products, and I don't know enough about that. So if, for example, they had come in 15 minutes later and by that point somebody had taken the flask and poured it into another – poured the liquid into another flask and left the residue in the first flask, the result would have been completely different? That's correct. That is correct. I have 53 seconds left, Roach. I do want to say it. So I'm up for five minutes. Thank you. All right. Thank you, Mr. Roach. Let's hear from Ms. Otake. Good morning. May it please the Court, counsel. My name is Jill Otake and I represent the United States in this matter. The question before this Court really is one of whether or not there is sufficient evidence to support the special jury verdict as to count one. And undoubtedly there was. Even putting aside for a moment the flask, Judge Tallman was correct to point out that there was overwhelming evidence that this conspiracy, and it was a charged conspiracy, had been manufacturing methamphetamine for more than just that day. The evidence showed, for example, that downstairs where the children were living in this house, the detectives found methamphetamine, coffee filters. In the living room, they found empty pseudoephedrine blister packs in the fireplace. Under the stairs of the staircase, they found glassware. In the kitchen, they found acetone, muriatic acid, commercial-sized coffee filters, and one large coffee filter with meth residue. In the defendant's bedroom, they found completed methamphetamine, which, frankly, logic tells you the defendant would not have bought methamphetamine if he could make it himself. In the defendant's bedroom, they also found the caffeine, a bag with 250 pseudoephedrine pills, coffee filters. There's no dispute that it was manufacturing methamphetamine and there was sufficient evidence to find that he did. My understanding of the dispute is was there evidence to find that he had 500 grams or more of a mixture or substance containing a detectable metal amount rather than an unknown amount. And, Your Honor, the question really would be if he had that if the charge was manufacturing. But because the charge was a conspiracy to manufacture, I think taking all the reasonable influences in favor of the government, any rational power of fact could have come to the conclusion that this man had, in fact, conspired or at least entered into an agreement to manufacture at least 500 grams. But the evidence that you just gave just shows there was a lot. It doesn't say how much a lot was. And that's accurate, Your Honor. We don't know the exact amount. So where would you get the 500 grams from, other than the glass? Well, what we do have is when you take all of the evidence in the light most favorable to the government, we have already a large amount of marijuana in the house. I'm sorry, excuse me, of methamphetamine in the house. And we have Stephen Reed's testimony about what could have been made from the blister packs, from the packs of pseudoephedrine that were found in the bag. Well, that doesn't count, does it? It has to be 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine in salts, isomers, or salts as isomers. Does this stuff be, I don't know what this means, salts, isomers, or salts as isomers, the ingredients? Right. So in order to make this. Is that right? That's right. So in order to make methamphetamine, the pseudoephedrine that was found in the bag in the closet would have had to have been processed. And Stephen Reed testified that it could have made up to 100 grams of methamphetamine just sitting there in the closet. So your argument is that you don't look at just what was found on the day of the search. The question is what evidence was before the jury of an ongoing conspiracy over what period of time was charged in the indictment? Over a five-year period. Over a five-year period, whether the jury could conclude from the evidence of whatever existed both on the day of the search and before that the conspiracy involved more than 500 grams of methamphetamine. That's correct. Is your Honor asking what evidence showed that? Well, yeah, I think it would be helpful, but I think we're getting a little bit hung up, as I assume defense counsel wants us to get hung up on, over the math, how we break down the flask. But with all due respect to your opponent, I'm not sure that's the correct question that we're asking when we're challenging or examining the evidence of a five-year conspiracy and a jury's special verdict that concludes that Mr. Bushman was involved in a conspiracy that had as its object the distribution of methamphetamine. That's absolutely correct, Your Honor, and you put it in a much better way than I did. And that is essentially our argument, that if the defendant had been charged only with manufacturing on that particular date, the defendant might have a very viable argument for this Court today on the mixture of substance issue. But that's, frankly, not what the defendant was charged with here. He was charged with the ---- Well, what theory was argued to the jury, though? I don't know, but what ---- The theory that was argued to the jury did relate to the flask. But on appeal, this Court is not only advised to but should consider all of the evidence the Court is not limited to the evidence that was ---- But as I understand the evidence that you're arguing to us, it still comes down to it was a long time and there was a lot of it, but not any way that we could actually figure out that there was 500 grams. That's accurate, Your Honor. But what I am saying is under the standard, when you take all of the evidence in the light most favorable to the government and you consider the evidence that did exist, could any reasonable trier of fact concluded that there was 500 grams or more of a mixture of substance of methamphetamine as part of the ---- Let's go back to the flask, though. Okay. Let's go back. Okay. The ---- we have Beltran and we have whatever happened after Beltran. But the question is, the first question is leaving Beltran aside for the moment. I gather that the theory, the flask theory would, as I said before, depend on exactly what stage in the manufacturing process the police happened to walk in. I would respectfully disagree with that in the sense that it was at the time the police found the flask and the mixture of substance at that point, I disagree with counsel that it wasn't a mixture. It was, in fact, a mixture at that point. That's why they needed to actually process it to pull out the methamphetamine. Reed just finished cooking, right? He, yeah, Mr. Reed finished cooking it. And so the stage of the process really was not particularly important. Well, is that because you think that the stuff that was at the bottom may have been distributed throughout at that point or could have been distributed throughout or because that doesn't matter, that the fact that it all precipitated to the bottom and the liquid could have been poured out but wasn't? That's the latter, Your Honor. I see. So then it does matter on the exact stage because if they had come ten minutes later and somebody had poured the liquid into a different flask, it would have been different. It would have been different except for the fact that there would have been evidence of what had just taken place, presumably. And the facts here. I see. So what you're saying is it doesn't matter when they walk in. It matters that, in fact, during the process this happened. That's correct. And to address the flask for a moment and to very quickly address Beltran-Felix, Judge, first of all, it's absolutely correct that Beltran-Felix is still good law. And the language in Sprague basically indicates that Beltran-Felix is still good law. You should answer one of Judge Tallman's questions about, well, is there any other sort of drug that falls into this category? And, frankly, there isn't. And ecstasy is made with saffron oil, which is a safe substance. Marijuana is made with seeds and dirt, and those are safe substances. If this Court is interested in deciding whether or not methamphetamine is in and itself a different entity, it really is. And the reason for that is because of the toxicity that goes with the manufacturing process. And because of that, methamphetamine has become an inherently dangerous, as Ms. Kubis found out in the course of this case. Is methamphetamine ever sold? The statute actually says 50 grams or more of methamphetamine or 50 grams or more of a mixture or substance containing a detectable amount of methamphetamine. Is methamphetamine ever sold as a mixture? Yes. It is sold with, for example, the denatured caffeine. It's sold, it's cut the way you would cut cocaine or other products. In fact, most of the time the So that distinction would have meaning even if we were to adopt the Seventh Circuit's approach to, i.e., the market overall. Right. And I think there's also a reasonable argument with regard to the marketable approach, if Your Honors are inclined to even consider that, that the process of manufacturing is a necessary aspect of the distribution of methamphetamine, because without it, it can't be distributed. Almost similar to the LSD paper. And ultimately, methamphetamine, I think Detective Johnson testified, and it was in the record that methamphetamine most of the time is actually not sold in its pure form. It's usually cut. If there are no further questions for the government at this time, I will rest on the briefs. Okay. Thank you very much. May I have my 53 seconds? You surely may. I just want to say one quick thing about what Ms. Lataki said. I actually was searching frantically for the indictment. It may or may not say a five-year period, but the evidence at trial was limited to a very brief period of time, the time during which Mr. Bushman had possession of these premises, which was about 20-something days. And the evidence at trial about the actual drug activities taking place inside that house was limited to the day of the raid itself. But the point I think that we were exploring with Ms. Lataki was on a conspiracy charge, given what was found on the day of the search, the question is whether or not a reasonable fact finder could look at everything that was found in the house and the garage and conclude that the object of this conspiracy involved more than 500 grams. They could look at all of that. They couldn't rationally conclude that on this evidence. Even though they found pure methamphetamine in the bedroom, which, as she argued to us, could be construed by a rational finder of fact as having been the product of a You could double the amount of that based on, in fact, the meth that had been cut was 60% pure, but we'll give them the benefit of the doubt. And we'll double the amount of that with caffeine, add in everything else, and you still come up short. But again, if you're talking about a conspiracy, and then the question is, could a rational prior of fact, in essence, I hesitate to use the word interpolate, but that's really what we're asking the jury to do here, could they look at the size and the scope of this operation on the day of the search and conclude over the period of the conspiracy that it had to involve more than 500 grams? The jury can make a reasonable inference. They can't speculate. And that's what they were asked to do, in this case, or what they would have been asked to do had that been the government's argument at trial.  Thank you. And there's a couple other issues, too. Thank you, Mr. Horsley. I appreciate the argument both of you made, and the matter just argued will be submitted.
judges: Rymer, Berzon, Tallman